# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                :

LUIS M.,[1]               :        3:24-CV-1782 (RMS)

        *Plaintiff,*      :
                :

v.                   :
                :

MARTIN J. O'MALLEY, COMMISSIONER :
OF SOCIAL SECURITY,[2]    :      NOVEMBER 6, 2025
        *Defendant.*     :
                :

------------------------------------------------------ x

## RULING ON THE PLAINTIFF'S MOTION FOR REMAND OR REVERSAL AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the plaintiff's application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act ("Act").[3] It is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Since the plaintiff filed this action, Frank Bisignano has been appointed as Acting Commissioner of the Social Security Administration. As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted for Martin O'Malley as the defendant in this matter. The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[3] Eligibility for disability insurance benefits is premised, in part, on a disabled claimant's "insured status" under Title II of the Act, *i.e.*, payment into Social Security through employment income for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), *id.* at 423(c)(1). "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability. *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013). *See* 42 U.S.C. § 1382(a). "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness." *Peterson v. Kijakazi*, No. 3:22-CV-00026 (VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023); *see Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003) (explaining, in a Social Security case, that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI").

The plaintiff now moves for an order remanding or reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner"). (Doc. No. 19). The Commissioner, in turn, has moved for an order affirming his decision. (Doc. No. 25). For the following reasons, the plaintiff's motion for an order reversing or remanding the Commissioner's decision is **GRANTED**, and the Commissioner's motion for an order affirming that decision is **DENIED**.

I.    <u>**PROCEDURAL HISTORY**</u>

On May 9, 2022, the plaintiff applied for SSI, claiming that he had been disabled since March 25, 2021. (Doc. No. 13, Certified Transcript of Administrative Proceedings, dated 02/10/25 ["Tr."] 17, 169). The plaintiff reported he could not work due to back pain. (Tr. 22–23). The plaintiff previously applied for SSI three times: (1) his November 28, 2012 application was denied on reconsideration on September 5, 2013; (2) his July 10, 2015 application was denied at the initial level on January 19, 2016; and (3) his February 10, 2020 application was denied by a decision of an Administrative Law Judge ("ALJ") on March 29, 2021 and by the Appeals Council on February 11, 2022. (Tr. 62–64).

The plaintiff's May 9, 2022 application was denied initially and upon reconsideration. (Tr. 68, 80). On September 26, 2023, ALJ Louis Bonsangue held a hearing during which the plaintiff and a vocational expert testified. (Tr. 34–61). On February 27, 2024, the ALJ issued an unfavorable decision denying the plaintiff benefits. (Tr. 14–32). The Appeals Council denied the plaintiff's request for review in November 2024, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1–5).

The plaintiff filed his complaint in this pending action on January 6, 2025. (Doc. No. 1). The same month, the parties consented to the jurisdiction of a United States Magistrate Judge, and

the case was transferred to the undersigned.  (Doc. Nos. 3, 11).  On May 27, 2025, the plaintiff

filed his Motion to Remand or Reverse the Decision of the Commissioner with a memorandum of

law.  (Doc. Nos. 19, 19-1).  The Commissioner filed his Motion to Affirm and memorandum of

law on August 22, 2025.  (Doc. No. 25).  The plaintiff did not file a reply.

## II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is

thoroughly discussed in the plaintiff's statement of material facts.  (*See* Doc. No. 20).  The Court

cites only the portions of the record that are necessary to explain this decision.

### A.    The Plaintiff's Hearing Testimony

On September 26, 2023, the plaintiff appeared telephonically for a hearing before the ALJ.

(Tr. 34–61).  His counsel, Meryl Spat, also appeared telephonically and requested an additional

consultative exam of the plaintiff; the ALJ consented and stated that the record would remain open

for two weeks after the hearing.  (Tr. 38–40).

The ALJ asked the plaintiff to testify about his work history.  The plaintiff worked some

jobs between 2008 and 2010.  (Tr. 42).  For four months in 2021, the plaintiff worked full-time as

a delivery driver for Main Street Chemists, East Main Street Pharmacy.  (Tr. 42–43).  The plaintiff

had not worked since.  (Tr. 43).  The plaintiff testified that he had food delivered to his apartment

and that his father is "the main provider" and "take[s] care[] of me every day."  (Tr. 48–49).

The ALJ and counsel elicited testimony about the plaintiff's physical limitations.  The ALJ

asked the plaintiff if he could drive himself to his doctor's appointments.  (Tr. 41).  The plaintiff

said "yes and no."  (Tr. 41).  When the ALJ asked the plaintiff what would prevent him from

driving, he said: "My waist, and my back, and my legs.  It's excruciating.  I have a lot of pain, so

it won't allow me to drive.  I lay down most of the day.  I don't – I'm always seated and laying

down." (Tr. 41). The plaintiff testified that he was having problems walking, he had "to use stuff to actually stand up because there's times that I have to get on my knees to actually stand up," and he was taking "heavy medications" for his pain. (Tr. 43, 47). The plaintiff explained that he had an MRI and was informed he had a herniated disc and sciatic nerve problems. (Tr. 44). The plaintiff stated that he was going through physical therapy. (Tr. 44). He said he could not bend over and touch the floor but could likely carry a gallon of weight. (Tr. 50).

As to the plaintiff's mental limitations, the plaintiff testified he had trouble remembering his appointments and must write them down. (Tr. 52). The plaintiff was not currently seeing a psychiatrist or counselor. (Tr. 53). The plaintiff testified that he had PTSD. (Tr. 55).

The plaintiff's paranoia was apparent during the hearing. He testified that, when he had an MRI, he was "always looking around because I have people waiting for me in the parking lot," and "they've always got this thing of always leaking my information and giving people my thereabouts." (Tr. 45–46). He said that he lived alone because he had "security problems," and "nobody [is] safe with me." (Tr. 45–46). He testified that he had "people coming over there, and they come from different states. . . . They come over here with guns." (Tr. 46). At times, the plaintiff's testimony was tangential and difficult to follow:

> Ma'am, I, see, I don't know these people. I don't -- I know, I actually don't know these people. They -- people, you know, I have a lot of people that I do know and a lot of people that I actually don't know because, you know, you don't actually know. I don't know. But there'd be people that there, and I already know what's going on.

(Tr. 46).

### B.    The Vocational Expert's Testimony

The vocational expert, Timothy Andenmatten, appeared telephonically and first testified that the plaintiff's past job would be titled "deliverer, merchandise." (Tr. 56–57). The ALJ then

presented several hypotheticals and asked the vocational expert to opine about the possibility of substantial gainful activity with the following assumptions: the individual had the same work history as the plaintiff, completed high school, and was about 40 years old.  (Tr. 57).

First, the ALJ asked the vocational expert to testify about available jobs if the hypothetical person was limited to the light exertional level, but also had limitations of: (1) occasionally climbing ramps or stairs; (2) never climbing any ropes, ladders, or scaffolds; (3) occasionally balancing, stooping, kneeling, crouching, or crawling; (4) recalling short, simple directions and basic procedures; (5) performing simple routine, repetitive tasks for two hour periods with customary breaks; (6) never interacting directly with the public; and (7) only adapting to minor and infrequent changes in the workplace.  (Tr. 57).  The vocational expert testified that a person with those limitations could not perform the merchandise delivery job, but could perform the jobs of marker, routing clerk, and mail clerk.  (Tr. 57–58, 61–62).

In response to questioning from the plaintiff's counsel, the vocational expert also testified that an individual's inability to follow instructions of any kind would preclude all work.  (Tr. 59). The vocational expert further testified that an employer would not tolerate more than one unscheduled absence each month and that there would be no work available for an individual who needed prompting three times a day to stay on task.  (Tr. 59–60).

C.    <u>**Medical Evidence**</u>

The record contains medical evidence from several providers: (1) Care Beyond Medicine, PLLC for primary care from September 16, 2021 to June 17, 2022; June 28, 2022 to January 27, 2023; and January 10, 2023 to August 25, 2023 (Tr. 251–293, 447–495, 500–529); Access Rehab Centers from July 6, 2022 to September 3, 2022 for physical therapy for the plaintiff's back (Tr. 294–351); and the Emergency Department ("ED") at St. Mary's Hospital from April 30, 2021 to

November 30, 2022 (Tr. 352–446). Because the medical evidence relevant to this appeal concerns the plaintiff's back pain and mental illness, the Court summarizes the medical evidence only as to these impairments.

On April 30, 2021, the plaintiff was brought to St. Mary's ED due to "agitation" and "erratic behaviors." (Tr. 354). The consulting psychiatrist noted the plaintiff was "quite antsy," "anxious," and "restless," and that his thought process was "tangential" and repetitive. (Tr. 354–358). The psychiatrist attributed the plaintiff's "nonsensical" nature to PCP and cannabis; the plaintiff reported he called the police because there was "chaos outside," and he worried that someone would call the police on him. (Tr. 354, 358).

On June 19, 2021, the plaintiff sought treatment at St. Mary's ED for back pain. (Tr. 359, 364). The treating physician described the plaintiff as presenting with hallucinations, disorganized speech, and "inappropriate laughter":

> Pt responding to internal stimuli, appears paranoid in waiting area walking around, talking to people that aren't there. . . . when pt answered questions he would laugh in between sentences. . . . Patient was a risk to himself and . . . was medicated with Haldol and Ativan in order to keep him calm and safe.

(Tr. 359–361). The plaintiff reported he had injured his back but "it doesn't matter when since the pain is there." (Tr. 359). The treating physician attributed the plaintiff's "altered mental status" to PCP use. (Tr. 361).

On August 1, 2021, the plaintiff again sought treatment at St. Mary's ED for back pain: "pt states he bent over the wrong way causing him immediate pain." (Tr. 364).

On August 17, 2021, the plaintiff sought treatment for a stabbing injury, and the treating physician at the ED described him as "agitated," "hyperactive," "paranoid," "impulsive," "hard to redirect," "difficult to answer questions," and "inappropriate." (Tr. 367, 370–371). The plaintiff's speech was described as "delayed" and "tangential," and his cognition and memory were

"impaired." (Tr. 370). A CT scan of the plaintiff's cervical spine revealed "[m]ild degenerative changes" and "[m]ild emphysematous changes of the visualized [lung] apices." (Tr. 378).

On August 25, 2021, the plaintiff returned for further treatment of his stab wound, and the ED noted:

> pt is responding to internal stimuli acting bizare n triage. Pt denies drug abuse. sweating and looking around acting paranoid. . . . patient is a poor historian. . . . Tangential, not making sense, needs constant redirection, does not demonstrate solid judgment capabilities

(Tr. 380, 382). The treating physician listed possible diagnoses as "[p]sychosis, schizophrenia, drug abuse, drug addiction." (Tr. 382).

On September 16, 2021, the plaintiff presented at Care Beyond Medicine for a physical with Dr. Philip Mongelluzzo, MD. (Tr. 253–254). Dr. Mongelluzzo noted the plaintiff struggled with chronic back pain and had a history of mental illness. (Tr. 253). Dr. Mongelluzzo further noted the plaintiff was "verbally" and "mentally challenged," refused to see a psychiatrist, and "c[ould ]not explain what mental illness he has." (Tr. 253).

Throughout 2021 and 2022, the plaintiff returned to Care Beyond Medicine for care. (Tr. 255–293, 447–495). Dr. Mongelluzzo noted the plaintiff reported "being arrested for multiple times due to impulsive behavior," consistently complained of chronic back pain, and was taking marijuana because "it makes him feel calm" and helped with his back pain. (Tr. 255, 257, 263).

On February 8, 2022, the plaintiff sought treatment at St. Mary's ED because his back pain was "constant, sharp, worse with ambulation, 7/10." (Tr. 279).

On February 18, 2022, the plaintiff sought treatment at St. Mary's ED for an infected finger but complained that "his lower back has 8/10 pain." (Tr. 387). The ED provider described the plaintiff as "agitated" with "[p]ressured speech" and "flight of ideas":

> Patient was a very poor historian and continually would have conversations with the wall and not with this provider. He was persistently requesting prednisone however was rocking back and forth in his chair standing up and sitting down repeatedly and pacing back and forth in the room.

(Tr. 389).

The plaintiff returned to St. Mary's ED on April 14, 2022 for low back pain and symptoms of sciatica. (Tr. 391). He described his pain as "8/10" and "constant, sharp, radiating a tingling/numbing sensation down his left leg." (Tr. 391). The ED provider noted that the plaintiff's mood was "anxious," his speech was "rapid and pressured," his behavior was "agitated," and his judgment was "impulsive." (Tr. 393). Dr. Mongelluzzo ordered an MRI of the plaintiff's lumbar spine on May 2, 2022. (Tr. 265).

The plaintiff was in a car accident on June 14, 2022. (Tr. 266). On June 17, 2022, the plaintiff sought treatment at St. Mary's ED for his back pain, which he described as "constant, sharp/aching/tightness" and the treating physician characterized as "[l]ikely muscular strain/sprain." (Tr. 394, 397).

On June 27, 2022, the plaintiff sought treatment at St. Mary's ED for a finger laceration. (Tr. 412). The ED provider described him as follows: "Flight of ideas, anxious appearing, pressured speech, pacing room, having conversations with himself." (Tr. 414). The ED provider noted the plaintiff had "erratic behavior" but that "this is patient's baseline from previous visits with myself." (Tr. 415).

On June 28, 2022, the plaintiff complained to Dr. Mongelluzzo of continued and exacerbated back pain. (Tr. 266). Dr. Mongelluzzo prescribed physical therapy, and the plaintiff participated in physical therapy at Access Rehab Center from July 2022 to January 2023. (Tr. 294–351, 480–495). Throughout the course of physical therapy, the plaintiff experienced constant "throbbing" pain ranging from a five to an eight out of ten on the pain scale. (Tr. 294, 299, 485).

On August 30, 2022, the plaintiff met with Dr. Mongelluzzo for an unrelated injury but also complained of chronic back pain. (Tr. 451). At that visit, the plaintiff "ke[pt] whispering to himself," appeared "very agitated," and frequently "rock[ed] back and forth" and "g[o[t up and s[a]t back down." (Tr. 451–452). Dr. Mongelluzzo's APRN, Sarah Walsh, noted that "his behavior is quite unsettling as his agitation is increasing." (Tr. 452). The plaintiff was "very vague" and agitated when asked about his mental illness and his attempts to see a specialist for his back pain. (Tr. 452) ("Patient reports he has no mental illness and gets very agitated when I asked him about it. . . . He did go to a place in New Haven that he said was a specialist. He reports he had to leave because the doctor said something to the nurse. He is being very vague and will not elaborate.").

On November 29, 2022, the plaintiff returned to Dr. Mongelluzzo's office to renew his medical marijuana card. (Tr. 453). He was "quite anxious" and "a bit tangential in his thought process." (Tr. 453–454). He reported that he was still struggling with back pain: "He has numbness from time to time and at times it is incapacitating." (Tr. 453).

On December 7, 2022, the plaintiff had a telehealth call with Dr. Mongelluzzo about steroids for his back pain. (Tr. 455). Dr. Mongelluzzo informed the plaintiff that he had a mixed connective tissue disease but that the steroids seemed to be working so far. (Tr. 458).

On January 10, 2023, the plaintiff had a telehealth appointment with APRN Sarah Walsh, where he told her his disability was not diagnosed, and his back had bothered him for years. (Tr. 456). APRN Walsh noted that the plaintiff had chronic back pain, a history of severe anxiety and agitation, and mixed connective tissue disease. (Tr. 457). APRN Walsh was not able to definitively diagnose the plaintiff. She wrote:

> Patient reports chronic back pain however admits that he has not had any diagnosis related to this. He reports no past x-rays and no testing for this. I have discussed

> that I need results to support the fact that he is disabled to be able to complete these forms. He has not had any testing done and refuses to go for any at this point. He feels his pain is enough. I attempted to discuss that we need actual diagnoses to complete these forms however he declines any further discussion. At this time I have no evidence to support that he is disabled and I am unable to state that he is disabled. We are unable to complete his forms.

(Tr. 457).

On January 27, 2023, the plaintiff had physical therapy at Access Rehab. He still could not bend over, squat, or lift from the floor without pain, and "nothing relieve[d] the pain." (Tr. 491–492). On February 1, 2023, the plaintiff met with Dr. Mongelluzzo about his back pain:

> He reports he started with pain a couple of years ago. He went to the hospital for "problems." He was told to change but wouldn't and he states that the security guard restrained him. He does not say when this happened. He does not give much information about specifics. Pain is in his mid to lower back. He reports more recently his entire leg has been numb. He reports he has not seen anyone for this previously as he does not want people to experiment on him.

(Tr. 502). The plaintiff appeared quite paranoid, but Dr. Mongelluzzo was able to convince him to receive an X-Ray. (Tr. 503). The plaintiff received an X-Ray of his lumbar spine on February 2, 2023, which showed mild degenerative changes. (Tr. 471).

On May 16, 2023, the plaintiff sought treatment at Care Beyond Medicine for back and neck pain from a car accident. (Tr. 504). He reported his pain as an eight or nine out of ten. (Tr. 504).

The plaintiff returned to Care Beyond Medicine on August 11, 2023 for a follow-up. (Tr. 506). He reported he was "unable to work as he cannot stand for 8 hours" and that he was discharged from his past practice due to "threatening behavior." (Tr. 506).

On August 25, 2023, the plaintiff had a follow-up with Dr. Mongelluzzo. His biggest concern was that he felt like he was disabled. (Tr. 512).

10

D.    **Medical Experts**

The record includes medical opinions from various experts.  The record includes reports from three state agency consultants who evaluated the plaintiff's medical records but did not meet the plaintiff.  At the initial stage of the plaintiff's social security benefits application, Dr. Gregory McCormack, MD, evaluated the plaintiff's physical impairments.  (Tr. 62–68).  At the reconsideration stage, Dr. Gregory Hanson, PhD, evaluated the plaintiff's mental impairments, and Dr. Ellen Humphries, MD, evaluated his physical impairments.  (Tr. 69–80).  The record also contains medical opinions from four consultative examiners who met with the plaintiff on a single occasion to evaluate his mental health.  On August 22, 2013, Dr. Diana Badillo Martinez, PhD, evaluated the plaintiff and wrote a report.  (Tr. 242–245).  On June 20, 2020, Dr. Cheryl Ellis, Psy. D, evaluated the plaintiff via a telehealth call and wrote a report.  (Tr. 246–250).  On February 1, 2023, Dr. Ananda Hernandez-Rivera, Psy D, evaluated the plaintiff via a telehealth call and wrote a report.  (Tr. 496–499).  On October 26, 2023, Dr. Jose Silgado, PhD, met with the plaintiff and wrote a report.  (Tr. 520–529).

1.    **Initial Stage**

At the initial stage of the plaintiff's SSI application, Dr. McCormack evaluated the plaintiff's physical limitations.  The record included one submission from the plaintiff's primary care provider Dr. Mongelluzzo, one submission from the plaintiff's physical therapy provider Access Rehab Centers, and one non-medical report from an unknown source.  The records summary reflected appointments in July 2022 at Access Rehab Centers and appointments in June 2022 with Dr. Mongelluzzo for the plaintiff's back pain.  (Tr. 63–64).

With respect to the plaintiff's physical residual functional capacity ("RFC"), Dr. McCormack concluded the plaintiff could lift or carry twenty pounds occasionally and ten pounds

frequently and was otherwise unlimited in his ability to push and pull; could stand or walk with normal breaks for six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently climb ramps, stairs, ladders, ropes, and scaffolds; could crawl, balance, kneel, and crouch; and occasionally stoop.  (Tr. 65–66).  Dr. McCormack noted the plaintiff could only sustain light work and that the plaintiff's exertional limitations resulted from his back pain, which Dr. McCormack characterized as severe symptomatic lumbar disc disease and osteoarthritis.  (Tr. 64, 66, 70).  Dr. McCormack noted there was no evidence of substance abuse.  (Tr. 67).

### 2.    Reconsideration Stage

At the reconsideration stage, Dr. Hanson evaluated the plaintiff's mental limitations and Dr. Humphries evaluated the plaintiff's physical limitations.  In addition to the evidence submitted at the initial stage, the record on reconsideration included reports from three consultative examiners, Drs. Hernandez-Rivera, Ellis, and Badillo Martinez; one additional submission from Dr. Mongelluzzo and two additional submissions from Access Rehab Centers; three submissions from Yale New Haven Health; one submission from UConn Health; one submission from St. Mary's Hospital; one submission from Community Health Center of Waterbury; and one non-medical functional report from the plaintiff.  (Tr. 70).  The records summary on reconsideration reflected appointments from June 2022 to February 2023 with Dr. Mongelluzzo and Access Rehab Centers for back pain; visits in June 2021 and June 2022 to St. Mary's ED for back pain; X-Rays of the plaintiff's lumbar spine; three psychological consultative examinations; the ALJ's March 2021 denial of the plaintiff's early SSI application; and August 2012 appointments with Wellmore Behavioral Health, which were not part of the record.  (Tr. 71–73, 75).

Dr. Humphries determined the plaintiff's physical RFC.  Most of Dr. Humphries's determinations mirror that of Dr. McCormack at the initial stage, except Dr. Humphries concluded

that the plaintiff could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds; balance; stoop; kneel; crouch; and crawl. (Tr. 75). Dr. Humphries attributed the plaintiff's exertional limitations to his chronic pain but noted that "[h]is statements as to the intensity and limiting effects of his conditions are not fully consistent with the medical evidence." (Tr. 75).

Dr. Hanson determined the plaintiff's mental RFC on reconsideration (the plaintiff did not allege mental disability initially). (Tr. 71, 75–77). Dr. Hanson concluded the plaintiff had a severe trauma-related mental disorder and a long history of drug abuse, which he classified as "obscured." (Tr. 72–73). Dr. Hanson found "no support for psychosis when clean and sober" and determined "[a]dditional testing [was] not recommended due to chronic, longitudinal DAA which would confound any formal testing." (Tr. 73). Dr. Hanson found that many of the plaintiff's mental abilities were not significantly limited: he could remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. (Tr. 75–77). Dr. Hanson concluded that the following mental abilities were moderately limited: the abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent

pace without an unreasonable number and length of rest periods; interact appropriately with the public; and respond appropriately to changes at work.  (Tr. 75–77).  Dr. Hanson explained that "[h]igh pressure or fast changing settings" would render the plaintiff "under duress" and likely to relapse, but "he can cope with minor changes, drive, form goals, identify dangers."  (Tr. 77).

### 3.    Consultive Examiners

Lastly, the record contains four reports from consultative examiners who evaluated the plaintiff's mental health: Dr. Badillo Martinez (Tr. 242–245), Dr. Ellis (Tr. 246–250), Dr. Hernandez-Rivera (Tr. 496–499), and Dr. Silgado (Tr. 520–529).

On August 22, 2013, Dr. Badillo Martinez conducted a psychological evaluation of the plaintiff for his November 2012 SSI application.  (Tr. 242–245).  Dr. Badillo Martinez observed:

> He is polite, cooperative, but engages in a very disorganized impulsive manner.  He is jittery, often bursting into bursts of giggles and laughter.  He stutters and has difficulty organizing his thoughts and statements are generally incomplete and difficult to follow.  Thought processes are overly concrete and he has very low understanding of hypothetical social situations.  Intellectual abilities impresses being within the extremely low range. . . . ability to concentrate and perform mental operations (three digits reversed) is severely impaired. . . . Affect is immature, giggling, and disinhibited. . . . Appears tentative, guarded and hesitant to reveal if he has auditory or visual hallucinations.  After awhile he acknowledges it, laughs nervously and does not want to reveal the content.

(Tr. 243).  Dr. Badillo Martinez's diagnostic impressions were "organic psychosyndrome," "psychotic disorder," and "[b]orderline intellectual functioning versus learning disability versus mild mental retardation."  (Tr. 244).  Dr. Badillo Martinez recommended a substance dependence evaluation and noted that, "[g]iven the present social interactions and cognitive capacities, it impresses he will have much difficulty being a reliable employee."  (Tr. 244).

On June 20, 2020, Dr. Ellis evaluated the plaintiff via telehealth for his February 2020 SSI Application.  (Tr. 246–250).  The historical information in Dr. Ellis's evaluation was "based on the claimant's statements during the examination."  (Tr. 246).  Dr. Ellis found the plaintiff's

14

thought process "lucid, clear, and goal-directed"; his memory intact; his concentration good; his mood relaxed; and his speech of "normal rate, tone, and inflection." (Tr. 248). Dr. Ellis noted the plaintiff "appears to have some difficulty with judgment, appears to have limited insight, [and] appears to over-extend information at times regarding his level of impairment." (Tr. 248–249). Dr. Ellis did not offer a diagnosis but concluded the plaintiff "has adequate adaptation skills but may tend towards more maladaptive means," and that his prognosis was "[g]ood, secondary to intervention, potentially for substance use." (Tr. 249).

On February 1, 2023, Dr. Hernandez-Rivera evaluated the plaintiff via telehealth for the May 2022 SSI application at issue in this case. (Tr. 496–499). Dr. Hernandez-Rivera concluded:

> Throughout the interview, although he was reporting not having any Mental Health problems or symptoms, not having any difficulties emotionally, he had a lot of problems with insight, with memory and recalling things, as well as being able to maintain pace, pressured speech and tangential throughout the interview. During this process, it was observed that he has paranoid thoughts, hypervigilance and is fearful whenever he is outside, around others, possibly due to his traumatic experiences while being "on the streets" and incarcerated. He did not report having flashbacks, nightmares nor problems with reliving past experiences, but did mention throughout the interview being scared, needing to protect himself and having trouble being around others. He does not report depressive, anxiety symptoms but was observed not being able to focus, understand questions, nor give complete answers to questions, particularly pertaining to history. He reports not doing much daily activities, functioning and carry out most tasks at home, not being able to sustain a job because of problems interacting with others, and needing help, particularly by his father, to keep his things in order. He has a lot of anger, resentment and difficulty managing thought processing.

(Tr. 498). Dr. Hernandez-Rivera noted the plaintiff needed a full psychological evaluation. (Tr. 498).

Following the plaintiff's September 26, 2023 hearing before the ALJ, Dr. Silgado conducted an additional in-person psychological evaluation of the plaintiff, observing:

> Claimant evidences paranoid thinking, displaying fears that others are out to get him (specifically, he fears people attempt to assassinate his character). He displays a disorganized thought process, and rambling, incoherent speech. . . . Overall,

> claimant verbalized significant mistrust of the mental health field. . . . claimant was
> an excessively poor historian regarding his alcohol and drug consumption.

(Tr. 522–523).  Dr. Silgado noted the plaintiff "[a]voids most interactions with people due to mental health concerns" and "[r]eports attending an employment interview at Hertz recently which ended poorly due to interpersonal issues (claimant became hostile and aggressive during the interview)."  (Tr. 524).

Dr. Silgado concluded that the plaintiff evidenced "significant impairment in basic activities of daily living," was "exceedingly paranoid about being around others, claiming people [we]re trying to assassinate his character," and was "unable to manage employment interviews due to ongoing severe mental illness and hostility."  (Tr. 525).  Dr. Silgado also noted, "There was evidence of hallucinations, delusions, and paranoia in evaluation; specifically, claimant was observed to at times speak out loud as if this evaluator was not present, potentially responding to internal stimuli."  (Tr. 525).  Dr. Silgado deemed the plaintiff's insight and judgment to be poor and his anxiety and psychotic moderate to severe.  (Tr. 525, 527).  Dr. Silgado noted:

> Overall, he is deemed to be at high risk for excessive employment absences due to mental health symptomatology.  Currently, claimant is not medicated or treated for his mental health symptoms, and he is highly encouraged to seek services through his local mental health authority (LMHA) where he may receive wrap-around support including psychiatric, psychological, case management, and supervised living if needed.  Claimant's mental health symptoms are unlikely to remit on their own and claimant is at high risk for recidivism and further mental health deterioration without further treatment or support. . . . Prognosis is poor, primarily due to severity and pervasiveness of symptoms, paranoia, and mistrust of the health field.

(Tr. 527–528).  Dr. Silgado's diagnostic impressions were unspecified schizophrenia spectrum and other psychotic disorder.  (Tr. 528).

III.    **THE ALJ'S DECISION**

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Act.  *See* 20 C.F.R. § 404.1520(a).[4]

At step one, the ALJ found the plaintiff had not engaged in substantial gainful activity since his application date, May 9, 2022.  (Tr. 19).

At step two, the ALJ determined the plaintiff had severe degenerative disc disease of the lumbar spine and PTSD.  (Tr. 19).  The ALJ noted the plaintiff had been diagnosed with substance use, but that this impairment did not cause any limitations in the plaintiff's ability to perform basic mental work activities and so was not severe.  (Tr. 20).

At step three, the ALJ found the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 20). In doing so, the ALJ considered the plaintiff's physical impairments against Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)) and 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), and his mental impairments against Listing

---

[4] An ALJ determines a claimant's disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, an ALJ must determine whether a claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment.  If none exists, then the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998).  If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that he cannot perform his former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that he cannot perform his former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows that he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

12.15 (trauma- and stressor-related disorders). (Tr. 20); *see* 20 C.F.R. part 404, Subpart P, Appendix 1.

Next, the ALJ formulated the plaintiff's RFC. A plaintiff's RFC is the most they can do despite their impairments and is determined by assessing all the relevant evidence. *See* 20 C.F.R. §§ 404.1545(a)(1). The ALJ determined the plaintiff had the RFC to perform light work with additional restrictions:

> occasionally climb ramps and stairs; never climb ropes, ladders, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; able to recall short, simple directions and basic procedures and perform simple, routine, and repetitive tasks for two hour periods with customary breaks; should not be required to interact directly with the public; and would be able to adapt to only minor and infrequent changes in the work environment.

(Tr. 22).

The ALJ summarized the plaintiff's testimony and found that his statements "concerning the intensity, persistence and limiting effects" of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 24).

The ALJ then summarized the objective medical evidence and the medical expert opinions. With respect to the medical opinions, the ALJ determined (a) the reports from the state agency consultations at the initial and reconsideration stages were persuasive as to the plaintiff's physical limitations; (b) the report from consultative examiner Dr. Ellis was somewhat persuasive as to the plaintiff's mental limitations; (c) the report from the state agency psychological consultant at the reconsideration level was persuasive as to the plaintiff's mental limitations; and (d) the reports from consultative examiners, Drs. Silgado and Badillo Martinez, as to the plaintiff's mental limitations were not persuasive. (Tr. 24–26). The ALJ did not state whether he was persuaded by consultative examiner Dr. Hernandez-Rivera's report, although he noted her findings were "overall unremarkable." (Tr. 25).

18

At step four, based on the testimony of the vocational expert, the ALJ found the plaintiff could not perform his past relevant work as a merchandise deliverer. (Tr. 26). However, the ALJ determined, at step five, that there are jobs that exist in significant numbers in the national economy that the plaintiff could perform, such as marker, routing clerk, and mail clerk. (Tr. 27). Given this finding, the ALJ found that the plaintiff was not disabled. (Tr. 28).

## IV.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Substantial evidence means more than a scintilla: "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 229 (1938)). Absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y. 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff

was not disabled." *Id.* "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have his disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## V.    **DISCUSSION**

The plaintiff raises several arguments in this appeal.  First, he argues that the ALJ placed undue weight on Dr. Hanson's opinion.  (Doc. No. 19-1 at 3–16).  Second, he contends that the ALJ failed to fully assess or consider Dr. Hernandez-Rivera's February 2023 psychological evaluation.  (*Id.* at 16–19).  Third, he maintains that the ALJ erred by discounting the reports from Drs. Badillo Martinez and Silgado.  (*Id.* at 20–21, 25–31).  Fourth, he claims that the ALJ erred by finding Dr. Ellis' psychological report more persuasive than the other three psychological evaluations.  (*Id.* at 21–25).  Fifth, he insists that remand is necessary for the formulation of an appropriate RFC because the ALJ overlooked or ignored crucial evidence.  (*Id.* at 31–33).  Though he captions his motion as one seeking remand or reversal, he argues solely in support of a request for remand, not for reversal and calculation of benefits.

The Commissioner challenges each of the plaintiff's arguments.  First, the Commissioner argues that substantial evidence supports the ALJ's RFC.  (Doc. 25-1 at 17–21).  Second, the Commissioner states that the ALJ properly evaluated the opinion evidence.  (*Id.* at 21–29).

For the following reasons, the Court finds that the case should be remanded on the ground that the ALJ did not properly evaluate the medical opinion evidence.  Because the case is remanded on this ground, the Court does not address whether the ALJ's RFC was improperly formulated.  On remand, the ALJ is instructed to: (1) re-evaluate the medical opinions consistent with this decision; and (2) re-formulate the RFC and re-evaluate steps four and five in light of this Court's

ruling and the revised RFC.

A.      **The ALJ Did Not Properly Evaluate the Medical Opinion Evidence.**

The plaintiff principally argues the ALJ improperly evaluated and credited the medical opinions in the record. (Doc. No. 19-1 at 3–33). A "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions," including a plaintiff's "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." 20 C.F.R. § 404.1513(a)(2)(i).

Section 404.1520c of Title 20 of the Code of Federal Regulations sets forth the parameters an ALJ must follow when evaluating the persuasiveness of a medical opinion. The Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ evaluates the medical opinions by applying the five factors listed in 20 C.F.R. §§ 404.1520c(c)(1)–(c)(5): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factors. Of these factors, supportability and consistency are the most important, and an ALJ must explicitly articulate how they considered them. *See* 20 C.F.R. § 404.1520c(b)(2). When considering supportability, an ALJ must look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1). A general reference to the overall record does not satisfy the supportability factor. The consistency factor relates to an opinion's consistency with other evidence in the record: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the

evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."   20 C.F.R. § 404.1520c(c)(2).

Where an ALJ fails to explain "supportability" and "consistency," lower courts have held that remand may be required when the ALJ does not "both identify evidence that supports his conclusion and build an accurate and logical bridge from the evidence to [his] conclusion to enable meaningful review."  *Gina B. v. Comm'r of Soc. Sec.*, No. 3:23-CV-00769-RAR, 2024 WL 4262640, at *6 (D. Conn. Sept. 23, 2024) (internal quotation marks removed) (citing cases). "Remand is unnecessary, however, where application of the correct legal standard could lead to only one conclusion."  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (internal citations and alterations omitted) (quoting *Johnson*, 817 F.2d at 986).  A court may thus affirm if the procedural error is harmless.  *Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022).

### 1.    Dr. Hanson

The plaintiff argues that the ALJ placed undue weight on Dr. Hanson's opinion.  (Doc. No. 19-1 at 3–4).  The plaintiff maintains that the ALJ's reliance on Dr. Hanson's opinion was erroneous because the opinion (1) heavily emphasized substance use in finding that the plaintiff was not disabled; (2) recited factual findings and legal conclusions from a prior ALJ decision; (3) referenced medical records not in evidence; (4) relied on a document with unknown contents; (5) did not consider the opinions of examining physicians Drs. Hernandez-Rivera and Silgado; and (6) failed to explore why the plaintiff had not sought psychiatric treatment.  (*Id.* at 4–10).

The defendant disagrees.  First, the defendant argues that the plaintiff's cited flaws in Dr. Hanson's opinion are immaterial because substantial evidence supported the ALJ's analysis.  In particular, the defendant contends, "The ALJ properly acknowledged that Dr. Hanson provided a

discussion of the evidence he relied upon to support his findings, without commentary, while relying primarily on the consistency of such findings with the other evidence of record."  (Doc. No. 25-1 at 22–23).  Second, the defendant points out that the plaintiff did not assert that his mental illness prevented him from seeking treatment, so it was not erroneous for Dr. Hanson and the ALJ to refrain from considering that possibility.  (*Id.* at 23).  Third, the defendant argues that Dr. Hanson was not required to consider the examinations of Drs. Hernandez-Rivera and Silgado.  (*Id.* at 24).

The ALJ's finding that Dr. Hanson's opinion was persuasive was explained briefly.  The ALJ stated, "This finding is supported by a discussion of the evidence that the consultant reviewed and upon which he relied (Exhibit B3A.  In addition, the opinion is consistent with the evidence in the record as a whole."  (Tr. 25).  Courts within this circuit routinely find legal error when the ALJ fails to meaningfully discuss or explain whether/how a state agency consultant supported their opinions with objective medical evidence.  *See, e.g.*, *Nancy S. v. Kijakazi*, 3:22-CV-00100 (SVN), 2023 WL 2628973, at *4 (D. Conn. Mar. 24, 2023) (finding the ALJ's two-sentence analysis was conclusory and "fails to appropriately consider either the supportability or consistency of the opinion"); *Matthew L. v. King*, No. 24-CV-0275 (RFT), 2025 WL 405812, at *1 (S.D.N.Y. Feb. 5, 2025) ("Beyond merely considering the supportability and consistency of medical source opinions, the ALJ must explain how he analyzed those factors.") (citing cases).  Indeed, during the rule-making process, the Social Security Administration explained the purpose of the articulation requirement: it "will allow a subsequent reviewer or a reviewing court to trace the path of an adjudicator's reasoning, and will not impede a reviewer's ability to review a determination or decision, or a court's ability to review our final decision."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5857 (Jan. 18, 2017); *see also Rubin v. Martin O'Malley, Comm'r of Soc. Sec.*, 116 F.4th 145, 154 (2d Cir. 2024) ("The explicit language of that

regulation requires that an ALJ consider and articulate 'how persuasive the SSA finds all of the medical opinions and all of the prior administrative medical findings in the claimant's case record.'" (quoting 20 C.F.R. § 404.1520c(b)) (internal alterations removed); *Raymond v. Comm'r of Soc. Sec.*, No. 5:19-CV-1313 (ATB), 2021 WL 706645, at *8 (N.D.N.Y. Feb. 22, 2021) ("At their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency for each of the medical opinions, pointing to specific evidence in the record supporting those findings.") (internal quotations marks omitted).

The Court finds that the ALJ committed error because the ALJ's assessment falls well below the requirement to explain the supportability factor.  Section 404.1520c(c)(1) requires the ALJ to explain whether and/or how each state agency consultant supported *their* opinions with objective medical evidence.  *See* 20 C.F.R. § 404.1520c(c)(1).  The ALJ stated that Dr. Hanson's findings were "supported by a discussion of the evidence that the consultant reviewed upon and upon which he relied" and "consistent with the evidence in the record as a whole."  (Tr. 25).  The ALJ did not explain how Dr. Hanson's findings were supported, and a general reference to the overall record does not satisfy the supportability factor.  *See, e.g., Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("It is not sufficient to cite to some objective medical evidence in the record and simply conclude that an opinion is consistent with other evidence in the file rendering it persuasive.") (internal quotation marks removed); *Kyle Paul S. v. Kijakazi*, No. 3:20-CV-01662 (AVC), 2021 WL 6805715, at *8 (D. Conn. Nov. 16, 2021) ("[T]he ALJ found that the opinions of the State agency consultants are persuasive because '[t]hese assessments take into account all of the treatment records.'  This explanation falls short of explaining how he considered supportability and consistency in determining the persuasiveness of the prior administrative findings, as he must under 20 C.F.R. § 404.1520c(b)(2)."); *Acosta Cuevas v. Comm'r Soc. Sec.*,

20-CV-0502 (AJN) (KHP), 2021 WL 363682, at *14 (S.D.N.Y. Jan. 29, 2021) (finding legal error when "[n]owhere in the ALJ's decision does she explain, as the new regulations require, what the respective CEs' used to support their opinions and reach their ultimate conclusions"); *Brianne S. v. Comm'r of Soc. Sec.*, No. 19-cv-1718-FPG, 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (finding legal error where "the ALJ did not examine what Doctors McGovern and Beaver used to support their opinions and reach their ultimate conclusions") (internal quotation marks removed); *Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *6 (D. Conn. June 21, 2022) (explaining that a "conclusory statement is insufficient to satisfy the articulation requirements of Section 416.920c(b)(2)"). Accordingly, the ALJ's failure to address the supportability factor alone is error.

Even if the ALJ's articulation of the supportability factor was sufficient, the Court also finds that the ALJ's conclusion that Dr. Hanson's opinion was "supported by a discussion of the evidence that the consultant reviewed upon and upon which he relied" constitutes error. (Tr. 25).

First, Dr. Hanson's explanation of his medical opinion included Dr. Mongelluzzo's January 10, 2023 note about the plaintiff's chronic back pain, in which Dr. Mongelluzzo stated that he could not complete the plaintiff's disability forms because the plaintiff would not consent to testing to diagnose the source of his back pain. (Tr. 73). But Dr. Hanson's opinion does not explain why Dr. Mongelluzzo's note about the plaintiff's potential *physical* disabilities has any bearing on Dr. Hanson's assessment of the plaintiff's potential *psychological* disabilities. (Tr. 73). As the plaintiff points out, Dr. Hanson's "opinion as to the plaintiff's mental condition is not supported by and cannot rely on a another specialist's assessment of a physical condition, spinal impairment." (Doc. No. 19-1 at 8); *see* 20 C.F.R. § 404.1520c(c)(4) ("*Specialization*. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and

training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."). Dr. Hanson's explanation of his opinion also included references to Dr. Mongelluzzo's January 27, 2023 and February 2, 2023 notes about the plaintiff's back pain. (Tr. 73). Since it is unclear to what degree Dr. Hanson's psychological opinion depended upon information related to the plaintiff's physical disability, the ALJ should have inquired further about the basis of Dr. Hanson's opinion.

Second, this procedural error was not harmless because the ALJ had significant reason to doubt Dr. Hanson's opinion. Dr. Hanson made findings and legal conclusions based on an unrelated ALJ decision on a prior disability application, made references to medical records that were not in evidence, and relied on medical evidence about the plaintiff's physical disabilities to draw conclusions about the plaintiff's psychological disabilities. The ALJ could not say with certainty that Dr. Hanson's opinion was supported by relevant medical evidence without reconciling Dr. Hanson's apparent reliance on evidence that was outside the record and from a time period that preceded the relevant time period for this disability determination. The ALJ had a duty to inquire further and clarify the basis of Dr. Hanson's opinion.

Moreover, the ALJ put greater weight on Dr. Hanson's opinion than the opinions of physicians who actually examined the plaintiff even though an examining medical expert's opinion should carry greater weight than the opinion of an expert who merely reviewed records. *See* 20 C.F.R. § 404.1520(c)3(c)(v) (2024). In particular, the ALJ found Dr. Hanson's opinion most persuasive even though it conflicted with the other four psychological medical opinions in the record, all of which found that the plaintiff suffered from psychological ailments. (Tr. 243–244, 249, 498, 527–528). If the ALJ had found the other four psychological medical opinions more

persuasive, the ALJ may have reached a different conclusion as to the plaintiff's RFC and whether there were jobs in the national economy that he could perform. Thus, on remand the ALJ must reassess Dr. Hanson's opinion.

### 2.    Dr. Hernandez-Rivera

The plaintiff argues the ALJ erred by failing to fully assess Dr. Hernandez-Rivera's February 2023 psychological evaluation of the plaintiff. (Doc. No. 19-1 at 16–19). The defendant responds that Dr. Hernandez-Rivera did not provide a medical opinion because her opinion did not contain any statements about the plaintiff's ability to perform basic work functions, so the ALJ did not need to assess the opinion's persuasiveness. (Doc. No. 25-1 at 29).

The plaintiff is correct that the ALJ did not state whether he was persuaded by Dr. Hernandez-Rivera's February 2023 evaluation of the plaintiff. The ALJ characterized Dr. Hernandez-Rivera's examination as follows:

> The claimant underwent a consultative psychological examination by Ananda Hernandez-Rivera, Psy.D. in February 2023. Although Dr. Hernandez-Rivera did not offer an opinion as to the claimant's mental functioning, her mental status findings were overall unremarkable apart from a depressed and anxious mood and affect (Exhibit B7F).

(Tr. 25). Not only is this "explanation" insufficient because it fails to even allude to the supportability or consistency factors, it also grossly mischaracterizes Dr. Hernandez-Rivera's report. Dr. Hernandez-Rivera's apparently "unremarkable" findings included that the plaintiff (1) had "paranoid thoughts, hypervigilance and is fearful whenever he is outside, around others"; (2) was observed "not being able to focus, understand questions, nor give complete answers to questions, particularly pertaining to history"; and (3) could not "sustain a job because of problems interacting with others." (Tr. 498). Contrary to the ALJ's statement and the defendant's argument that Dr. Hernandez-Rivera's opinion did not include an opinion or finding as to what the plaintiff

could do despite his impairments and whether the plaintiff had one or more impairment-related limitations, Dr. Hernandez-Rivera concluded that the plaintiff had difficulty focusing, understanding and answering questions, and interacting with others. (Tr. 498). He also had "a lot of anger, resentment and difficulty managing thought processing," which would impact his ability to sustain employment. (Tr. 498). Further, Dr. Hernandez-Rivera determined that the plaintiff had post-traumatic stress disorder and/or a psychotic disorder. (Tr. 498). Thus, the ALJ's characterization of Dr. Hernandez-Rivera's findings as "overall unremarkable apart from a depressed and anxious mood and affect" is patently inaccurate, and the ALJ was required to give a more fulsome assessment.

While an ALJ is entitled to reconcile conflicting evidence in the record and need not address every piece of medical evidence, "the ALJ must provide a reviewing Court with a sufficient explanation to ensure that they have complied with the legal procedures controlling their decision and cannot ignore or mischaracterize evidence." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Cuevas v. Comm'r Soc. Sec.*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022); *Steven M. v. Comm'r of Soc. Sec.*, No. 3:22-cv-01455-RAR, 2023 WL 8183550, at *5 n5 (D. Conn. Nov 27, 2023). The ALJ's failure to explain whether Dr. Hernandez-Rivera's medical opinion was persuasive, consistent with other opinion and medical evidence, and supported by objective medical evidence is error. As such, on remand the ALJ must assess the persuasiveness of Dr. Hernandez-Rivera's report.

### 3.    Drs. Badillo-Martinez and Silgado

The plaintiff argues the ALJ erred by rejecting Dr. Badillo-Martinez's opinion because it was not stale and was consistent with the medical evidence in the record. (Doc. No. 19-1 at 20–

21).  The defendant responds that the plaintiff's objection "is nothing more than his assertion that he would have evaluated the factors differently" and that the ALJ's "discounting of the opinion because it was based on a remote examination was appropriate."  (Doc. No. 25-1 at 26).

As for Dr. Silgado, the plaintiff argues the ALJ failed to assess the opinion's supportability and consistency, "unfairly parsed the report," and was internally inconsistent with his assessment of the other opinions.  (Doc. No. 19-1 at 25–31).  The defendant responds that the ALJ properly explained why he was not persuaded by Dr. Silgado's opinion, and the "[p]laintiff's objections are again primarily a recitation of his alternative assessment of the evidence."  (Doc. No. 25-1 at 27).

When reviewing an ALJ's evaluation of a medical opinion, the court must strike a careful balance.  On the one hand, a reviewing court may not "decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner."  *Kyle Paul S. v. Kijakazi*, No. 3:20-CV-01662 (AVC), 2021 WL 6805715, at *6 n.12 (D. Conn. Nov. 16, 2021); *see also Cohen v. Comm'r of Soc. Sec.*, 643 F. App'x 51, 53 (2d Cir. 2016) ("The Commissioner retains the discretion to reach a conclusion inconsistent with an opinion of a treating physician where that conclusion is supported by sufficient contradictory evidence.").  On the other hand, the Commissioner does not have unbridled discretion to cherry-pick evidence that supports his desired outcome.  *See Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022).  "Cherry-picking can be defined as inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source."  *Id.* (citation and internal quotation marks omitted).  It "can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both."  *Id.* (citation and internal quotation marks omitted).  The Second Circuit has repeatedly taken note of "cherry picking" as a factor in demonstrating error.  *See Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (opining

that "the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimalizing"

a treating physicians opinion under the earlier regulations) (citation omitted); *Rucker v. Kijakazi*,

48 F.4th 86, 94 (2d Cir. 2022) (opining that "it was not permissible for the ALJ to 'cherry-pick[ ]'

the positive aspects of the progress reports to discount [the treating psychiatrist's] opinion as

unsupported by the evidence") (citing *Estrella*, 925 F.3d at 97).

The Court finds that the ALJ inappropriately cherry-picked evidence to conclude which

medical opinions were persuasive.  As the plaintiff points out, the ALJ found Dr. Silgado's opinion

unpersuasive in part because it was based on a one-time evaluation of the plaintiff, but the ALJ

credited Dr. Ellis's opinion as partially persuasive despite it also being based on a one-time

evaluation of the plaintiff.  (Tr. 24–26).  Similarly, the ALJ discounted Dr. Silgado's opinion

because evidence received at the hearing level was not available to Dr. Silgado, although the same

was true for Dr. Ellis, and this fact did not weigh against the persuasiveness of her opinion.  (Tr.

24–26 ).  Further, the ALJ did not address the fact that Dr. Ellis's opinion was rendered before the

alleged onset date (Tr. 24–26), while the ALJ found that Dr. Badillo-Martinez's opinion must be

irrelevant because it predated the plaintiff's current application date.  (Tr. 26).  The Commissioner

is correct that the ALJ has the discretion to weigh different factors as he sees fit, but here, the ALJ

did not provide a satisfactory explanation for applying these factors so seemingly disparately.  On

remand, the ALJ must reassess the persuasiveness of the medical opinions and satisfactorily

explain his reasoning.[5]

---

[5] The plaintiff also argues that the ALJ erred by finding Dr. Ellis's opinion partially persuasive because Dr.
Ellis "did not attempt to diagnose the plaintiff," and "her opinion predated the alleged onset."  (Doc. No.
19-1 at 22).  Dr. Ellis examined the plaintiff in 2020, before the alleged onset date of his disability, which
should have caused the ALJ to question whether Dr. Ellis's opinion was relevant (as the ALJ did for Dr.
Badillo Martinez' opinion, (Tr. 26)).  The ALJ conceded that Dr. Ellis did not have the opportunity to
review all of the claimant's medical records before issuing her opinion and that the evidence received at
the hearing level would support a finding that the plaintiff had greater limitations than those assessed by
Dr. Ellis.  (Tr. 25).  The ALJ did not, however, acknowledge that "all historical information in [Dr. Ellis's]

### B.    The Plaintiff Claims that the ALJ's Formulation of the RFC Overlooked Crucial Evidence and Failed to Reconcile Conflicting Evidence.

The plaintiff's RFC indicated that he was able to recall short, simple directions and basic procedures and perform simple, routine, and repetitive tasks for two-hour periods with customary breaks; should not be required to interact directly with the public; and would be able to adapt to only minor and infrequent changes in the work environment.  (Tr. 22).  The plaintiff argues that, in formulating this part of his RFC, the ALJ overlooked evidence, did not reconcile conflicting evidence, and did not account for many of his limitations caused by his mental disabilities, such as his difficulties interacting with others and concentrating.  (Doc. No. 19-1 at 31–32).  Upon remand, after considering the medical evidence and the medical opinions in the record using the correct legal standard, the ALJ must reformulate the RFC.  As a result, the Court need not address the argument presented here that the ALJ committed harmful error in determining the plaintiff's RFC.

### VI.    CONCLUSION

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 19) is **GRANTED** and the Commissioner's motion to affirm that decision (Doc. No. 25) is **DENIED**.  The Clerk shall enter judgment and remand this matter to the Commissioner for further administrative proceedings consistent with this decision.  The Clerk is respectfully requested to close this case.

This is not a Recommended Ruling.  The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules

---

evaluation is based on the claimant's statements during the examination," (Tr. 246), which is notable because numerous providers described the plaintiff as a poor historian and an inaccurate source of information about his abilities.  (Tr. 253, 257, 367–368, 380, 389, 451–452, 453, 497–498, 505, 525).  On remand, the ALJ should reassess the persuasiveness of Dr. Ellis's opinion.

of Civil Procedure.  Appeals from this judgment can be made directly to the appropriate United

States Court of Appeals.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

It is so ordered this 6th day of November 2025, at New Haven, Connecticut.

___/s Robert M. Spector__ _____
Robert M. Spector
United States Magistrate Judge